Case 2:20-cr-00009-EWH-RJK Document 129 Filed 07/06/22 Page 1 of 24 PageID# 2512

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-4196**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

NIKIA TULL,

Defendant - Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Robert G. Doumar, Senior District Judge. (2:20−cr−00009−RGD−RJK−1)

---

Argued: May 5, 2022 Decided: July 6, 2022

---

Before WYNN, HARRIS, and RUSHING, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Harris and Judge Rushing concurred.

---

**ARGUED:** Lawrence Hunter Woodward, Jr., RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT & WOODWORD, P.C., Virginia Beach, Virginia, for Appellant. Daniel Patrick Shean, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Defendant Nikia Tull appeals from a jury verdict convicting her of thirty-three counts of aiding and assisting in the preparation of false tax returns and five counts of wire fraud. She argues that the evidence was insufficient to support the jury's verdicts; that the Government made inappropriate references to her prior convictions that prejudiced her defense; and that the district court should have severed the tax-preparation counts from the wire-fraud counts. We affirm.

I.

Tull was the founder and co-owner of a tax-preparation business, YT Phoenix Enterprises, Inc., d/b/a Phoenix Financial Tax Service ("Phoenix Financial"). Through Phoenix Financial, Tull and her employees prepared and filed tax returns on behalf of their clients. Phoenix Financial charged its clients varying fees based on the complexity of their returns. The complexity was determined in part by the number of forms required, such as whether the client needed to file a Schedule C to report profit or loss from a sole proprietorship.

As a professional tax preparer, Tull was required to obtain a Preparer Tax Identification Number ("PTIN") from the Internal Revenue Service ("IRS"). PTINs are unique to the individual and may not be shared with other tax preparers. Tull was issued a PTIN for use at Phoenix Financial in 2011. But, unbeknownst to the IRS, at the time Tull applied for her PTIN, she had two felony convictions: in 2004, she pleaded guilty to Virginia felony embezzlement under Va. Code § 18.2-111; and in 2005, she pleaded guilty to Virginia felony forgery and misdemeanor use of identifying information to defraud

Case 2:20-cr-00009-EWH-RJK Document 129 Filed 07/06/22 Page 3 of 24 PageID# 2514

under Va. Code § 18.2-172 and -186.3, respectively. The 2005 convictions related to a bail-bond application she had made for her brother, in which she provided a false name and Social Security Number, along with a false Virginia identification card. The IRS typically would not grant a PTIN to someone with such convictions.

Sometime before early 2017, the IRS began investigating Phoenix Financial after one of its clients was audited. An undercover IRS agent visited Phoenix Financial in the spring of 2017, posing as a taxpayer seeking assistance preparing and filing his tax return. The resulting return that Phoenix Financial filed included several falsified items for which the undercover agent had provided no documentation. Identifiable IRS agents first visited and interviewed Tull in May 2017.

The Government ultimately indicted Tull on thirty-three counts of aiding and assisting in the preparation of false individual tax returns, relating to tax returns filed between 2014 and 2018 on behalf of eleven different individuals or couples; and five counts of wire fraud, relating to Tull's attempts to defraud a lender, FORA Financial, in September 2019.[1] Tull moved to sever the wire-fraud charges from the tax-preparation charges, but the district court denied the motion.

A jury trial was held over the course of seven trial days in November 2020. At the beginning of the trial, the district court denied Tull's motion in limine to exclude evidence of her 2004 and 2005 convictions. Tull moved for a judgment of acquittal several times, and the district court denied each motion. The jury found Tull guilty on all counts.

[1] The superseding indictment included two other charges that the Government moved to dismiss before trial. Those charges are not relevant here.

The district court sentenced Tull in April 2021. After departing downward from the Guidelines range due to Tull's mental-health issues resulting from serious trauma in her past, the district court sentenced her to a total effective sentence of 33 months, plus three years of supervised release and $162,460 in restitution. Tull timely appealed.

On appeal, Tull challenges only her convictions, not her sentence. First, she claims that the evidence was insufficient to support the jury's verdicts. Second, she contends she was prejudiced by the Government's references during trial to her prior convictions. Finally, she argues that the district court should have severed the tax-preparation charges from the wire-fraud charges. We disagree with Tull on all these points and therefore affirm.

II.

We begin with the sufficiency of the evidence. A defendant appealing the denial of a Rule 29 motion for a judgment of acquittal "faces a heavy burden." *United States v. Dennis*, 19 F.4th 656, 665 (4th Cir. 2021) (quoting *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011)). Although we review the denial of such a motion de novo, we "must affirm a conviction when substantial evidence viewed in the light most favorable to the prosecution supports the verdict." *United States v. Barringer*, 25 F.4th 239, 252 (4th Cir. 2022) (quoting *United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021)). Thus, "we must uphold the jury's verdict if '*any* trier of fact could have found that the evidence—either direct, circumstantial or a combination of both—along with any reasonable inference[s]' established the essential elements of the crime beyond a reasonable doubt." *United States v. Rafiekian*, 991 F.3d 529, 547 (4th Cir. 2021) (quoting *United States v. Fall*, 955 F.3d 363, 377 (4th Cir. 2020)). "In determining whether substantial evidence exists, we 'make

all reasonable inferences in favor of the [G]overnment and do not weigh evidence or credibility.'" *Barringer*, 25 F.4th at 252 (quoting *Moody*, 2 F.4th at 189). Thus, "reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *United States v. Smith*, 21 F.4th 122, 140 (4th Cir. 2021) (internal quotation marks omitted).

The Government easily satisfies the standard for affirmance in this case. However, in analyzing the other issues before us on appeal, it is important to note that the evidence not only satisfies the deferential review of a Rule 29 denial, but also is overwhelming. Accordingly, we will review the trial evidence in some detail, beginning with the evidence related to the tax-preparation convictions before turning to the wire-fraud verdicts.

A.

The statute at issue in the thirty-three tax-preparation charges criminalizes "[w]illfully aid[ing] or assist[ing] in, or procur[ing], counsel[ing], or advis[ing] the preparation or presentation under . . . the internal revenue laws, of a return . . . , which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return." 26 U.S.C. § 7206(2). This provision thus punishes those who willfully aid in the preparation of someone else's false tax return. *United States v. Kimble*, 855 F.3d 604, 614 (4th Cir. 2017). "[A] conviction under Section 7206(2) is appropriate when the [G]overnment shows: '(1) the defendant aided, assisted, or otherwise caused the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) the act of the defendant was willful.'" *Id.* (quoting *United States v. Aramony*, 88

F.3d 1369, 1382 (4th Cir. 1996)). A single materially false item on a return is sufficient. *See United States v. Null*, 415 F.2d 1178, 1181 (4th Cir. 1969); *United States v. Briscoe*, 65 F.3d 576, 588 (7th Cir. 1995).

The essence of the Government's case was that, for each of the thirty-three returns cited in the indictment, Tull filed a return on behalf of a client that included at least one materially false line item. The falsified items were not always the same, but the vast majority of them fell into four categories: residential energy credits for solar-electric property costs; charitable gifts by cash or check; unreimbursed employee expenses; and business losses. The willfulness of Tull's endeavor was supported by the fact that she was experienced in tax preparation and repeatedly claimed the same false line items. *E.g.*, *United States v. Diamond*, 788 F.2d 1025, 1030 (4th Cir. 1986) (noting "extraordinary sophistication with respect to tax matters" as circumstantial evidence of intent); *United States v. Jennings*, 51 F. App'x 98, 100 (4th Cir. 2002) (per curiam) ("[T]he jury could have inferred guilt, especially as to willfulness, from [the defendant's] repeated pattern of failing to obtain sufficient documentation despite the obvious disproportion between the deductions and available income on the returns." (internal quotation marks omitted)).[2] The Government's evidence tended to show a twofold motive: first, to make clients happy by increasing their tax refunds, with the aim that they would return and would refer others to Phoenix Financial—indeed, clients received referral bonuses of $50 to $100—and second,

[2] *See also United States v. Conlin*, 551 F.2d 534, 536 (2d Cir. 1977) ("That appellant was more than simply careless is indicated by both the frequency and similarity of his misstatements."); *United States v. Allen*, 551 F.2d 208, 210 (8th Cir. 1977) ("Knowing and willful falsification may be inferred from repetitious omissions of items of income.").

to increase Phoenix Financial's revenue because its fee structure was based on the number of forms filed for any given return, and some of the falsified items required filing forms that otherwise would not have been necessary for those clients' returns.

This basic framework was supported by testimony from each of the eleven taxpayers, or from one spouse of the taxpaying couple, whose returns were involved. Each taxpayer testified that, for each return in question, they either worked directly with Tull or were assured that she would review their return before it was filed. Each testified that at least one item on each relevant return was false. Each testified that they did not provide documentation supporting those false items. And each testified that they did not ask Tull or her employees to inflate their refund and did not notice the falsified aspects of the return when signing. As to the latter point, several explained that they trusted Tull to file the return correctly or that they were only provided part of the return at the time of signing, such as the first few pages showing their income.[3]

Corroborating this taxpayer testimony was testimony from IRS agents and the documentary evidence of the returns themselves. Each return shows that it was submitted by Tull using her PTIN. Further, Tull is listed as the contact for Phoenix Financial's two Electronic Filing Identification Numbers and is the only person whose PTIN is listed as using those Electronic Filing Identification Numbers for calendar years 2014 and 2015. For

---

[3] Even if the jury did not believe that the taxpayers were unaware of the errors on their returns, that would make no difference for § 7206(2) liability. *See Kimble*, 855 F.3d at 615 ("Section 7206(2) explicitly provides for liability for tax preparers, like Defendant, who submit fraudulent returns, regardless of whether the taxpayer was aware of, much less consented to, any such fraud.").

calendar years 2016 through 2018, other PTINs also used Phoenix Financial's Electronic Filing Identification Numbers, but Tull is still noted as filing a significant number of returns.

The undercover agent who visited Phoenix Financial in the spring of 2017 testified that he posed as a taxpayer while secretly recording the visit using a hidden camera. Clips from the encounter were played in court. They show that the agent met with a temporary employee, Helen Manning, who primarily filled out his return. Eventually, she appeared to run into a problem and went to get Tull, who came into the office, sat at the computer, and worked on the return. At the end of the recording, Tull left the room, and the undercover agent's understanding was that she did so to pull up his tax return on another computer. He understood that she finalized his return from there. The return listed Tull as the preparer and included two items that were not based on information the agent had provided to Manning or Tull: a $4,000 tuition deduction and a $200 credit for a retirement-savings contribution.

Finally, several former employees testified. Phoenix Financial's staff included three primary individuals—Tull; her stepson Ndoro Tull ("Ndoro"); and, for a few years, an employee named Yolanda Brown—along with a rotating cast of temp-agency hires who were around for only a few weeks at a time. Tull, Ndoro, and Brown testified at trial, as did three temporary employees: Felecia Kelley, Piedra Pinder, and Manning.

Kelley, Pinder, and Manning each testified that they worked at Phoenix Financial for a few weeks (in 2014, 2016, and 2017, respectively) and that their role was to enter data before sending the return to Tull for her to review and file it, during which time Tull could

alter the return. Manning testified that all returns were submitted from Tull's computer, Pinder stated that Tull had administrative control of the tax-preparation software they used, and each of the temporary employees testified that they did not have access to Tull's computer or passwords and were not aware of other employees signing or submitting returns under Tull's name. Additionally, each of these employees was paid hourly, meaning they had no direct incentive to inflate the number of forms filed and thereby increase Phoenix Financial's revenue.

Brown, who worked for Phoenix Financial from January 2015 to March 2017, testified that Tull hired her, was her boss, and was in charge of everyone in the company. Like the others, she was paid a flat rate, with the exception of one bonus she received. Brown agreed with Pinder that Tull was the only person designated as the administrator in the software they used, and that the administrator could modify the return—including altering the record of who worked on the return. Brown confirmed that only Tull's computer could submit returns to the IRS and that Tull performed final reviews of returns after other employees, like Brown, input clients' information. And she testified that, although she had access to Tull's passcode, she could not access Tull's computer without Tull being present because her office was locked. All four of the employees further testified that they never input false information, including denying that they ever filed a return using Tull's PTIN.

Putting all this evidence together, a clear picture emerges from the Government's case. Crediting the Government's witnesses, Tull was the person in charge at Phoenix Financial and filed all the returns in question from the computer in her office, to which

access was restricted by a locked door and passcodes. In doing so, she claimed false line items that were not supported by documentation provided by the client or input by another employee. She repeatedly claimed the same sorts of false line items. This led to greater refunds for her clients and allowed her to charge higher fees for including additional forms such as Schedule Cs. Based on the Government's evidence, then, the prosecution satisfied the three elements of § 7206(2): Tull "aided, assisted, or otherwise caused the preparation and presentation of" each of the returns in question because she actually filed all of them; each "return was fraudulent or false as to a material matter" because each included at least one falsified item that impacted the taxpayer's tax liability; and Tull acted willfully. *Kimble*, 855 F.3d at 614 (quoting *Aramony*, 88 F.3d at 1382).

Tull vigorously disputes each element, but her challenges fall flat. Taking the elements in the reverse order, Tull disputes the Government's evidence for willfulness, arguing that the evidence is consistent with mere mistake and that the Government has not pointed to a motive because Phoenix Financial only received a few hundred dollars for each return. But there was plenty of evidence from which the jury could infer willfulness. The returns at issue consistently claimed the same false expenses. Further, if the jury credited the Government's witnesses, none of the clients provided the false information, nor did the other employees input it. This means that Tull added in falsified line items, many of which required completing separate forms, with absolutely no basis for doing so. It is hard to say that one repeatedly "accidentally" claimed credits for solar energy for clients with no solar sources at their homes, or that one repeatedly "accidentally" filled out Schedule Cs for clients who did not have their own businesses.

Regarding the second element, material falsity, the taxpayers' testimony, if credited, establishes that each return at issue included at least one falsified item that was material because it altered their refund amount. Tull has sought only to undercut the Government's case for a few returns. But we have carefully reviewed the record and conclude that the evidence thoroughly supports that there was at least one materially false item on each return.

That leaves the question of whether Tull filed each of the returns, or at least assisted in their preparation. Tull does not dispute that she filed ten of the returns at issue in this case. As for the rest, as noted, the Government's evidence was damning: the returns each reflected Tull's name and unique PTIN; each client testified that they either worked with Tull directly or were assured she would review the return before filing; the undercover agent understood Tull to have filed his return; and employees testified that Tull was in charge, that they did not falsify returns themselves, and that they did not file returns using Tull's PTIN.

Seeking to undermine this narrative, Tull relies almost exclusively on her own testimony, with minor assistance from the testimony of her stepson, Ndoro. Ndoro began working for Phoenix Financial in December 2013, when he was eighteen years old. Although he testified to having *prepared* returns for two of the taxpayers in this case, he also repeatedly testified that he did not *file* any of the returns himself, but rather simply input data and then transferred the returns to someone else to finalize and file. Still, he also testified that, while Tull was the only other person in the office in 2014, in later years, Tull was not available as much, and Brown filed returns using Tull's name. He stated that

Brown had access to Tull's computer and used it to file the returns. And he testified that he prepared returns using Tull's PTIN until he obtained his own PTIN.

Tull's testimony was similar, except that she more directly implicated Ndoro. Tull contended that Brown and others had access to her computer. She claimed that, in the 2015 and 2016 calendar years, she was largely absent and did not sign a single tax return—rather, Brown, Ndoro, and Pinder filed returns under her PTIN. She claimed she did not know at the time that she was not allowed to share her PTIN. And she explained that she returned in the 2017 calendar year to clean up messes left by Brown. She denied having filed the undercover agent's return, claiming instead that she had just answered questions for Manning and that Manning then filed it.

To support her testimony, Tull presented a series of exhibits that she claimed were transmission logs from Phoenix Financial's tax-return software, showing who within the office worked on and filed each return—and thus purportedly revealing that she was not the employee to prepare or file most of the returns. Yet the records have little to commend them. There is no logo on the records to indicate that they came from the software. The font appears to change from record to record and sometimes within individual records, which may be suggestive of alteration. Indeed, the only evidence that these records came from Phoenix Financial's tax software and that they were unaltered came from Tull herself—and she could not remember even the year when she printed them out.

The jury was certainly not required to accept the validity of the logs or Tull's self-serving testimony. For one thing, they were not required to believe Tull at all. When it comes to the sufficiency of the evidence, credibility determinations are solely the jury's

domain. *Barringer*, 25 F.4th at 252. But moreover, for the reasons noted, the provenance of the alleged transmission logs is questionable at best.

Moreover, Tull faced the problem that both the wire-fraud charges and one of her prior convictions involved the use of falsified documents, and the wire-fraud charges specifically involved the alteration of computer-generated documents. In other words, the jury could easily conclude that these alleged event logs were just another example of Tull's apparent modus operandi: falsifying documents as it suited her.

Finally, Tull presented an alibi defense as to four of the returns, all of which were filed in March 2015. She contended that on the dates those returns were filed, she was out of the office for medical reasons. The only date she provided specifics for was March 17, when two of the returns were filed. She claimed that she spent five to six hours at a medical treatment center that day. But when the Government started asking questions about the duration of the appointment, she backtracked and said she was not sure how long it was. In fact, her medical records showed that she checked into her doctor's office at 9:36 a.m. and checked out at 10:00 a.m. The two returns were not filed during that time. On redirect, Tull claimed that after her appointment, she returned home at her doctor's instruction rather than going to the office, an explanation that the jury was not required to credit.

All told, the extensive evidence in this case was more than sufficient to support the verdicts.

B.

We next turn to the five wire-fraud convictions. The wire-fraud statute prescribes punishment for anyone who, "having devised or intending to devise any scheme or artifice

to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. Thus, "[w]ire fraud under 18 U.S.C. § 1343 requires evidence showing that the defendant (1) devised or intended to devise a scheme to defraud and (2) used or caused the use of wire communications in furtherance of that scheme." *United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018) (citing *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012)). The indictment charged Tull with committing wire fraud five times between September 4 and 5, 2019, related to loan applications and supporting documentation she submitted to FORA Financial.

The Government's evidence was as follows. FORA Financial offers loans to small businesses. Its loan applications require applicants to attach the three most recent months of business bank statements to demonstrate cash flow. Tull reached out to FORA Financial in August 2019 and spoke on the phone with Daniel Santiago, a capital specialist. They entered into email correspondence, and she filed an initial application for a $50,000 loan on August 20, 2019, to which she attached accurate bank statements. FORA Financial denied the application via an August 22 email from Santiago due to low deposit volume. Santiago stated in his email that once Phoenix Financial's monthly revenue began to increase again, FORA Financial would be willing to lend to Tull.

On September 4, 2019, Tull emailed Santiago to take him up on that offer, asking him to reopen her $50,000 application. She provided statements for a different bank

account showing much higher volumes, such that her loan application would now qualify for consideration. Santiago sent her a new application, which she sent back the same day. Later that day, he asked for an August statement, which she provided. The application came from Tull's IP and email addresses.

The following day, Tull filed a third, $20,000 loan application, this time for herself and her husband, Sean Tull ("Sean"), who was listed as the secondary owner of Phoenix Financial. Again, the application came from Tull's IP and email addresses. And she again submitted bank statements in support of the loan application, which were transmitted separately from the application. Santiago requested Tull's driver's license and a voided check, which she provided, along with Sean's license. Over the following days, including on September 6, 9, and 10, the pair exchanged numerous emails as Santiago requested other documents and Tull responded. Ultimately, Tull's second and third loan applications were also denied.

During the IRS's investigation of Tull for the tax-preparation charges, agents became aware that she may have submitted fraudulent loan applications to FORA Financial. IRS agents subpoenaed Phoenix Financial's bank records and found that while the bank statements attached to the *first* application in August were accurate, those attached to the second and third applications in September had been doctored.

In her testimony, Tull conceded that she reached out to FORA Financial in August, spoke to Santiago on the phone, and executed the first, accurate application on August 20. But in her telling, once that application was rejected, she told Sean of the rejection, "and

that was it"—she washed her hands of the situation. J.A. 1027.[4] She claimed no familiarity with the falsified second and third applications and said that someone else must have signed her name on those applications and corresponded with Santiago using her email address. She indicated that the culprit was "probably" Sean, who had access to her email. J.A. 1076. And she testified that she did not open or read the numerous emails related to the application that came from Santiago in early September.

As with the tax-preparation charges, the Government's wire-fraud case against Tull was overwhelming. There is no dispute that she began corresponding with Santiago on August 20 and submitted a loan application. Yet she claims that, after receiving the denial on August 22, she was unaware of multiple emails being sent to and from the same email address less than two weeks later. The jury was certainly within its rights to reject the notion that someone else opted to leap into the middle of this correspondence, posing as Tull, to seek loans for her business.[5] And again, there is the issue of modus operandi: the jury could very well conclude that Tull has demonstrated a knack for forging or altering documents, and that she therefore had the know-how to alter the bank statements at issue here.

Tull argues that the Government has insufficiently connected her to the email account used in the correspondence. She cites cases related to the authentication of electronic documents, including a district court case which states that "[t]he [G]overnment

[4] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[5] Moreover, even if the jury believed that someone else *was* involved, the indictment also charged Tull with aiding-and-abetting liability under 18 U.S.C. § 2.

may not rely *exclusively* on [a] defendant's prior use of the email address . . . to authenticate the documents." *United States v. Shah*, 125 F. Supp. 3d 570, 577 (E.D.N.C. 2015) (emphasis added). But the Government did not rely solely on Tull's prior use of the email address. Rather, facts tending to show that Tull was the one engaging in these communications included that (1) she was known to have used the email address a mere twelve days earlier; (2) the email communications on and after September 4 pertained to the same matter and were with the same person as the earlier email communications that she conceded to having engaged in, and it is hard to believe that, after engaging in multiple emails back and forth from August 20 to 22, she would not notice additional emails back and forth with the same individual between September 4 and 10; (3) the applications included her name and identifying information, such as her Social Security Number; (4) Tull had the most to gain from any loans secured for Phoenix Financial, since she was the primary person running that business; and (5) the fraud in these charges involved the falsification of documents, something for which Tull has a demonstrated ability.

Accordingly, the jury acted well within its discretion in concluding that the Government had satisfied its burden as to the wire-fraud charges.

III.

Tull next challenges the Government's references during the trial to her 2004 and 2005 Virginia convictions for forgery, embezzlement, and use of identifying information to defraud. "[W]hen [specific constitutional guarantees] are not at issue, a finding of error as to a prosecutor's remark requires that it 'so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.'" *United States v. Runyon*, 707 F.3d 475,

507 (4th Cir. 2013) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "That is, [Tull] must show both '(1) that the [G]overnment's remarks were in fact improper and (2) that the remarks prejudicially affected [her] substantial rights so as to deprive [her] of a fair [trial].'" *Id.* at 510–11 (some internal quotation marks omitted) (quoting *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003)).

Under the Federal Rules of Evidence, evidence of prior convictions "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with th[at] character," but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1), (2). When admitted for these proper purposes, such evidence is sometimes referred to as "modus operandi" evidence. *E.g.*, *United States v. Siegel*, 536 F.3d 306, 318 (4th Cir. 2008). The district court admitted the evidence only for the proper category of purposes and so instructed the jury.

On appeal, Tull does not challenge the admissibility of the evidence.[6] Rather, she argues that the Government prejudicially referred to her convictions throughout the trial. She points to a few instances during witness testimony when, she claims, the Government referred to the convictions for an improper purpose: to show that she was "inherently

---

[6] At oral argument, Tull's counsel appeared to indicate that she *was* challenging the evidence's admissibility, but that she was focusing primarily on challenging the Government's prejudicial references to it. However, her brief contains no developed argument as to admissibility. Accordingly, she has waived any such argument. *United States v. Said*, 26 F.4th 653, 660 n.11 (4th Cir. 2022).

untrustworthy." Opening Br. at 9, 11. Yet several of her cited instances are of no help to her: they involved testimony that merely provided background about the convictions, evidence of which the court had admitted; were questions asked by her own attorney; or involved sustained objections.[7]

There are a handful of instances, however, that raise potential red flags. In one, the Government asked one of Tull's witnesses whether the witness really believed Tull had "change[d]," given the similarities between her past and present charges. J.A. 829–30. Similarly, the Government pressed another of Tull's witnesses as to whether the past convictions affected the witness's opinion of Tull's honesty and truthfulness. J.A. 870. Finally, the Government stated in closing that Tull is "a convicted forger and a convicted embezzler" before questioning whether the jury should trust her testimony and the documents she provided over official Government records.[8] J.A. 1147.

---

[7] The court instructed the jurors that they must "entirely disregard[]" any testimony "to which an objection was sustained by the Court." J.A. 1179.

[8] Tull does not actually cite this statement. Her brief states broadly that the Government made improper statements during closing arguments, but she fails to provide any citations to the record to support this assertion, as required by Federal Rule of Appellate Procedure 28(a)(8)(A). Where a party fails to comply with Rule 28(a), we often deem the argument waived. *E.g.*, *Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 580–81 & n.5 (4th Cir. 2017). We opt to consider it here for completeness and because it makes no difference to our analysis.

Even assuming these statements were improper,[9] *and* assuming Tull preserved her objections to them below,[10] they are not enough to require reversal. In evaluating the prejudice caused by a prosecutor's improper remarks, "we consider a number of factors, including: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." *Runyon*, 707 F.3d at 511 (quoting *Higgs*, 353 F.3d at 330). "Also relevant . . . is [] 'the issuance of curative instructions from the court,' which . . . the jury is presumed to follow." *Id.* (citation omitted) (quoting *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005) (en banc)); *see also United States v. Cowden*, 882 F.3d 464, 473 (4th Cir. 2018) ("[A]ny prejudicial effect [arising from the admission of evidence under

[9] The Government contends that the convictions could be cited for impeachment purposes under Federal Rule of Evidence 609 and that Tull forfeited the protections of Rule 404(b) when she put her character and the nature of her prior crimes at issue. Response Br. at 22, 48 (citing Fed. R. Evid. 609(a)(2); *United States v. Johnson*, 634 F.2d 735, 737–38 (4th Cir. 1980)). We do not reach these arguments because, in any event, we affirm.

[10] If Tull did not object below, our review would be for plain error. *United States v. Webb*, 965 F.3d 262, 267 (4th Cir. 2020). Although Tull objected to the introduction of the evidence, and objected to some questions the Government asked about it, it does not appear she objected to the three cited Government statements. Tull argued below that she had made a "standing objection" to the use of the evidence, but it is not clear that the district court understood itself to have permitted such a standing objection. J.A. 1326; *cf. United States v. Weaver*, 282 F.3d 302, 308 (4th Cir. 2002) ("The [district] court . . . permitted [the defendant] to have a standing objection to any witness or evidence relating to the bank's insured status."); *United States v. Johnson*, 54 F.3d 1150, 1165 n.1 (4th Cir. 1995) (Payne, J., concurring) ("The record shows that the District Court and the parties understood that previous objections had been preserved with a standing objection."). But, again, we do not reach this issue because we may affirm even without applying the plain-error standard.

Rule 404(b)] was reduced by the district court's issuance of two sets of limiting instructions[.]").

Tull cannot show prejudice here. The statements are isolated, taking up a few lines across more than a thousand pages of trial transcripts spanning seven days of trial. Both the Government and the court told the jury that it was *not* to consider the prior convictions as propensity evidence. The fact of Tull's prior convictions was already before the jury, meaning the references were unlikely to mislead them, particularly in light of the curative instructions. And finally, as detailed above, the evidence against Tull was extensive. *Cf. United States v. Woods*, 710 F.3d 195, 205 (4th Cir. 2013) ("[E]ven in the absence of the prosecutor's improper statement, [the defendant's] credibility would have been significantly weakened by the direct conflict between his testimony and that of the several government witnesses and the documentary evidence.").

Accordingly, we reject Tull's argument that she was prejudiced by the Government's references to her prior convictions.

IV.

Finally, Tull challenges the joinder of the tax-preparation counts with the wire-fraud counts. She appeals the district court's rulings under both Federal Rule of Criminal Procedure 8(a)—which permits joinder where the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan"—and Rule 14(a)—which permits "separate trials of counts" if joinder "appears to prejudice a defendant." Fed. R. Crim. P. 8(a), 14(a). The district court found joinder to be appropriate under Rule 8(a) because the offenses were

"of the same or similar character" and declined to find prejudice under Rule 14(a). J.A. 131. We affirm because even if the district court's decisions were in error—a question we do not reach—that error was harmless.

A.

"Whether offenses in an indictment are improperly joined under Rule 8(a) is a question of law reviewed de novo." *United States v. Cardwell*, 433 F.3d 378, 384–85 (4th Cir. 2005). "If the initial joinder was not proper, however, we review this nonconstitutional error for harmlessness, and reverse *unless* the misjoinder resulted in no 'actual prejudice' to the defendant[ ] 'because it had [no] substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Hawkins*, 776 F.3d 200, 206 (4th Cir. 2015) (quoting *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003)).

We need not resolve whether joinder was proper under Rule 8(a) in this case because, even if it was not, that error was harmless. *See United States v. Blair*, 661 F.3d 755, 769 (4th Cir. 2011) (assuming that joinder was improper, but nevertheless affirming on the basis of harmlessness). "[I]ndicia of harmlessness" include "(1) whether the evidence of guilt was overwhelming and the concomitant effect of any improperly admitted evidence on the jury's verdict; (2) the steps taken to mitigate the effects of the error; and (3) the extent to which the improperly admitted evidence as to the misjoined counts would have been admissible at trial on the other counts." *Mackins*, 315 F.3d at 414 & n.9.

Here, all these indicia point to the alleged error being harmless. The evidence against Tull on all counts was overwhelming. The district court properly instructed the jury that each count needed to be considered separately and that the verdict on one count should

not control the verdict on another count. *See Blair*, 661 F.3d at 769–70. Further, the evidence was distinct on the various counts, reducing the risk of "a prejudicial spillover effect." *Id.* at 769. Yet, at the same time, the crimes were similar enough that joinder was unlikely to create prejudice in the way that, say, joinder of a kidnapping charge with a tax-fraud charge would. *Cf. Hawkins*, 776 F.3d at 210–12 (holding that joinder of a carjacking count with a felon-in-possession count that involved the possession of a different gun weeks later was prejudicial). Finally, it appears likely that the most relevant evidence—namely, the falsified documents—would have been mutually admissible in separate trials for the two categories of charges as modus operandi evidence permitted under Rule 404(b)(2). *See* J.A. 133 (district court concluding that, "[i]f severance were granted, it appears possible that the evidence for tax fraud would be admissible, at least in part, in a separate trial on the [wire-fraud] charges, under Federal Rule of Evidence 404(b)"). Accordingly, we affirm the district court's decision as to joinder under Rule 8(a).

B.

Tull further argues that, even if the charges were properly joined under Rule 8(a), they should have been severed under Rule 14(a) to avoid prejudice. Rule 14(a) provides in relevant part that, "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "We review the district court's refusal to sever a properly joined count under Rule 14 for abuse of discretion," and we may uphold the district court's refusal to sever under Rule 14(a) "for the same reasons" we find

misjoinder harmless under Rule 8(a). *Blair*, 661 F.3d at 768, 770. Because we conclude that any Rule 8(a) error was harmless, we also reject Tull's Rule 14(a) argument.

V.

For the foregoing reasons, we affirm Tull's convictions.

*AFFIRMED*